IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | | |
|---|---|---|
| Ruth Simmons, | ) | Civil Action No.: 9:08-3511-SB |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **(Jury Trial Requested)** |
| vs. | ) | |
| | ) | |
| Beaufort, Jasper, Hampton Comprehensive Health Services, Inc. a/k/a Beaufort-Jasper-Hampton Comprehensive Health Services, PO Incorporated, | ) ) ) ) | |
| Defendant. | ) | |

The Plaintiff, complaining of the Defendants, does hereby respectfully allege as follows:

1. The Plaintiff, Ruth Simmons, is a citizen and resident of Beaufort County, South Carolina.

2. The Defendant, The United States of America, is the proper party to this action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et. seq.

3. Upon information and belief, Beaufort, Jasper, Hampton Comprehensive Health Services, Inc. a/k/a Beaufort-Jasper-Hampton Comprehensive Health Services, PO Incorporated ("Comprehensive Health") is a federally supported health center and Dr. Annette Bey ("Bey") is a physician employed by Comprehensive Health, together with Patricia A. Shockey ("Shockey"), T. Ray Sherbert ("Sherbert") and John Doe ("Doe").

4. The Federally Supported Health Centers Assistance Act of 1992 (Pub. L. 102-501) provides coverage to federally supported health care centers and its employees for acts or omissions which occur on or after January 1, 1993, or when the health center is deemed eligible for coverage, whichever is later. Comprehensive Health is a federally supported health center and was eligible for federal tort claim act coverage prior to any acts giving rise to liability in this complaint. Therefore,

1

Comprehensive Health, Bey, Shockey, Sherbert, and Doe are deemed to be Public Health Service employees covered by 42 U.S.C. § 233 (a) for acts and omissions which occurred to Ruth Simmons. At all times mentioned herein, Comprehensive Health, Bey, Shockey, Sherbert, and Doe were acting within the course and scope of their employment and/or agency with Comprehensive Health when rendering care to Ruth Simmons.

5. Though not a party to this action, Beaufort Memorial Hospital ( "Beaufort") is an entity incorporated under the laws of the State of South Carolina and is licensed and doing business in the County of Beaufort, State of South Carolina. Beaufort is currently a defendant in South Carolina Civil Case Number 07-CP-07-3018 currently pending in the Beaufort County Court of Common Pleas. The Plaintiff was forced to file a Complaint against Beaufort in State court as a result of an impending statute of limitation, yet Plaintiff is informed and does believe that Beaufort should be added as a party to this Complaint as a matter of pendant jurisdiction.

6. Though not parties to this action, Phillip Blalock, MD ("Blalock") and William Jackson, MD ("Jackson"), upon information and belief, are citizens and residents of Beaufort County, South Carolina. The Plaintiff was forced to file a Complaint against Blalock and Jackson in State court as a result of an impending statute of limitation, yet Plaintiff is informed and does believe that Blalock and Jackson should be added as parties to this Complaint as a matter of pendant jurisdiction.

7. This Federal District Court has jurisdiction of this action pursuant to its federal question jurisdiction as provided for by 28 U.S.C. §§ 1331 and 1346 and in compliance with 28 U.S.C. §§1346(b), 2671-2680 et seq., commonly known as the "Federal Tort Claims Act," which vests exclusive subject matter jurisdiction of Federal Tort Claims litigation in the Federal District Court.

8. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this district.

9.    The Defendant has the right or power to direct and control the manner in which its employees and/or agents provide medical care and operate the business of delivering health care for a fee through its hospital and practice, including but not limited to Bey, Shockey, Sherbert, and Doe.

10.   The Defendant has a non-delegable duty to provide physicians and staff adequately trained and able to provide any necessary and reasonable medical care to patients at its respective hospitals.

11.   Upon information and belief, the Defendant has attending physicians, nurses and other staff who are its agents, servants, and employees, and all acts or omissions complained of in this Complaint, performed by the agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Defendant.

12.   At all times relevant to this action, physicians, nurses, residents, interns and staff health care providers caring for Ruth Simmons were employees and/or agents of the Defendant, or were apparent agents and were acting within the course and scope of its employment and/or agency or apparent agency.

13.   Ruth Simmons and members of her family justifiably and reasonably believed that certain physicians, nurses, residents, interns and the other staff health care providers of the Defendant were agents and/or employees of the Defendant.

14.   On or about December 14, 2004, Ruth Simmons had an abnormal breast exam, specifically of her left breast, during her gynecological examination with Comprehensive Health performed by Doe and/or Bey. Ruth Simmons had not had a previous abnormal breast exam. Doe and/or Bey requested a "screening mammogram" even though the standard of care as a result of an abnormal finding required a diagnostic mammogram and biopsy be ordered, as breast cancer is common and may mimic benign disorders, the approach to all breast symptoms and findings is to

conclusively exclude cancer.

15. The screening mammogram was performed on the same date, by Comprehensive Health technician Shockey and interpreted by Comprehensive Health radiologist Sherbert. The report read, "views of both breasts reveal dense breast parenchyma bilaterally which limits the sensitivity of the examination and could obscure a mass if present. I see no dominant mass." This was noted to be a baseline screen, and there was no noted communication to the radiologist that the patient had an abnormal breast exam. Mammogram results should not alter the decision to perform a biopsy.

16. Ruth Simmons returned on March 14, 2005, to Comprehensive Health, for the mammogram results and was seen by Bey. Bey ordered a breast ultrasound, when she should have ordered a biopsy.

17. The breast ultrasound was performed on April 5, 2005, at Beaufort for "lump in left breast," by Jackson and was signed by Blalock. The impression read, "Innumerable fairly well defined discrete hypoechoic nodular densities throughout the breast with markedly increased blood throughout the breast particularly associated with these nodules. The exact etiology remains elusive. Correlation with the patient's mammogram may be useful. Whether these represent some type of varicosity it is difficult to discern. Consideration for surgical consult might be given as well." The report is also noted to read, "CC: BEY, ANNETTE, MD."

18. Amy Wilson ("Wilson"), a Physician Services Analyst at Beaufort, has avered under oath that the results of the report were successfully delivered to Bey on April 7, 2005.

19. No record of the report appears in Comprehensive Health's files or records.

20. Bey failed to follow up on her order for an ultrasound, failed to obtain the results of the ultrasound that she ordered, failed to realize that it had not been sent to her, and further continued to fail to order a biopsy.

21. Ruth Simmons never received a follow up call from Bey or Comprehensive Health, nor from Jackson, Blalock or Beaufort Memorial concerning her condition.

22. Ruth Simmons actually made a follow up appointment on her own on and was finally seen by Benjamin Gaines, MD, ("Gaines") and Comprehensive Health on February 23, 2006. Gaines noted, "LT breast mass x 1 year, increased in size." Gaines further noted, "nodular mass 3 x 2 cm/fixed" Gaines noted that he reviewed the left breast ultrasound with the patient and also noted her left breast mass as "suspicious." Gaines ordered a diagnostic mammogram and an appointment for a surgical biopsy with Gordon E. Krueger, MD ("Krueger") of Coastal Carolina Surgical Associates, PA.

23. Gaines' request noted, "45 yr old female with LT breast mass x 1 year. Mass nodular ~ 3x2cm, please evaluate."

24. Another mammogram was performed, this one at Beaufort Memorial, on February 23, 2006. The report noted that a marker was placed over the area of palpable abnormality in the inferomedial left breast, and compression spot images were obtained over the area of palpable abnormality. The impression read: "THE PALPABLE ABNORMALITY CORRESPONDS TO A 3 TO 4 CM AREA OF INCREASED DENSITY SOMEWHATNODULARAND WITH ILL DEFINED MARGINS POSTERIORLY. BREAST ULTRASOUND AND SURGICAL CONSULTATION ARE ADVISED." The report also notes that "prior films are at Comp Health and are not immediately available." It was reported by Blalock and signed by Jackson.

25. Krueger, on March 3, 2006, wrote back to Gaines and noted, "[i]t is certainly of significant concern with this mass appearing to be fixed to the chest wall...we will rapidly need to get an aspiration or core biopsy done in the next few days to prove that this is probably an advanced left breast cancer."

26. Another ultrasound was performed on March 3, 2006. The report read, "THERE IS A MULT-LOBULAR SOLID MASS IN THE RETROAREOLAR REGION HAVING INCREASED IN SIZE COMPARED

TO *04/05/05.* BIOPSY IS ADVISED." This was also reported by Blalock and signed by Jackson.

27. Krueger noted on his March 3, 2006, progress notes, in part, "HIGHLY SUSPICIOUS MASS LEFT BREAST WITH SKIN FIXATION ACCESSORY BREAST NIPPLES BILATERALLY."

28. Ruth Simmons followed up at Comprehensive Health on March 7, 2006, and the notes read, "to see Dr. Krueger today and will probably have excision."

29. Ruth Simmons subsequently underwent a vacuum assisted core biopsy and clip localization at Beaufort Memorial on March 9, 2006, which revealed infiltrating ductal carcinoma.

30. Ruth Simmons further accepted a plan for treatment with neoadjuvant chemotherapy prior to having a primary excision.

31. Kreuger referred Ruth Simmons to Sea Island Cancer Center for neoadjuvant chemotherapy and placed a right subclavian Port-A-Cath on March 23, 2006 to facilitate chemotherapy.

32. The exam of Majd Chahin, MD at the Sea Island Cancer Center on April 12, 2006 revealed "left breast positive for 5x4 ~ cm mass fixed to the skin below the left areola with positive lymph nodes in the left axilla." His impression was "Stage III breast cancer in a young female without any significant past medical history and subcoronallymph node, etiology unclear."

33. Ruth Simmons began neoadjuvant chemotherapy on April 12, 2006. Listed in order of occurrence, her complications from chemotherapy treatment from April 12, 2006, until her surgical admission for modified left radical mastectomy on December 7, 2006 were: back pain; nausea; decreased appetite; dry skin; movement hindered by Port-A-Cath site irritation; fatigue; arthralgias; heat intolerance; hospitalization at Beaufort Memorial for severe extremity pain and fever; persistent aches unresponsive to Percocet; right axilla cyst; hospitalization at Beaufort Memorial for neutropenic fever; significant edema of lower extremities; weakness; and others.

34. Chemotherapy agents utilized on Ruth Simmons during this time included: four cycles of

6

Adriamycini Cytoxan; four cycles of Taxotere; two cycles of Gemzarl Navelbine and others.

35. Ruth Simmons was admitted to Beaufort Memorial on December 7, 2006 for "Left axillary sentinel node attempted biopsy followed by left modified radical mastectomy." She proceeded to have marked postoperative swelling and was returned to the operating room on December 8, 2006, for evacuation of left mastectomy hematoma with estimated blood loss of 400 ml of clot. She subsequently received a blood transfusion of two units. She was discharged on December 12, 2006.

36. Ruth Simmons had a Consult with Dr. Cynthia J. Bryant, Keyserling Cancer Center for radiation treatment at Beaufort Memorial Hospital, on January 9, 2007, which revealed a diagnosis of "invasive ductal carcinoma of the left breast, multicentric, Stage III."

37. Ruth Simmons continues to treat with Sea Island Cancer Center and Krueger, and has undergone additional rounds of chemotherapy.

38. Ruth Simmons, if treatment had been undertaken immediately and the standard of care been met, would have had Stage 0 or Stage I cancer, and would have survived and lived a normal life span. As a direct and proximate result of the Defendant' deviations and delays, Ruth Simmons now has virtually no chance of long term survival of her advanced breast cancer.

**FOR A FIRST CAUSE OF ACTION**
**(Professional Negligence / Negligence per se)**

39. The Plaintiff repeats and realleges all prior Paragraphs above as fully as if repeated in its entirety in this Paragraph.

40. The Defendant, by and through its agents and/or employees, did undertake the duty to render medical care to Ruth Simmons in accordance with the prevailing and acceptable standards of care for health care facilities, nurses, doctors in the national community and, at a minimum, in accordance with the generally recognized and accepted practices and procedures that would be

followed by average, competent practitioners in the Defendant' field of medicine under the same or similar circumstances.

41.     While Ruth Simmons was under the care of the Defendant, it departed from the prevailing professional standards of care and recognized and generally accepted standards and treatment of Ruth Simmons and were thereby negligent, careless, *grossly* negligent, reckless, and negligent *per se* and acted in violation of the duties owed to Ruth Simmons in that it committed one or more of the following acts of omission or commission, any or all of which were departures from the prevailing professional standards of care:

a.  in failing to ensure that Ruth Simmons was properly and adequately evaluated, monitored, treated and thoroughly screened for signs of breast cancer;

b.  in failing to order a diagnostic mammogram upon the presence of a suspicious mass and in failing to order a biopsy;

c.  in failing to conduct the needed assessments;

d.  in failing to follow up on tests ordered and in failing to communicate the results of tests to other care providers and Ruth Simmons;

e.  in failing to supervise physicians, nurses, staff, students and residents;

f.  in failing to have in place proper and adequate policies, procedures and protocols for management of patients such as Ruth Simmons', or, if such policies, procedures and protocols were in place, in failing to use due care to enforce them;

g.  in failing to properly have in place and adequate policies, procedures and protocols for exchange of test results and communication of the same, if such policies, procedures and protocols were in place, in failing to use due care to enforce them;

h.  in failing to properly have in place and adequate policies, procedures and protocols for knowing when to order appropriate tests and make appropriate referrals or, if such policies, procedures and protocols were in place, in failing to use due care to enforce them;

i.  in failing to properly have in place and adequate policies, procedures and protocols for knowing when to utilize proper studies or, if such policies, procedures and protocols were in place, in failing to use due care to enforce them;

j. in failing to timely administer orders of the physicians;

k. in failing to properly train and educate its nurses and staff or, if properly trained and educated, in failing to allow its nurses and staff to exercise independent judgment and skill and the failure of nurses and staff to exercise chain of command;

l. in failing to properly monitor and respond to Ruth Simmons' symptoms;

m. in failing to make proper and timely notification of Ruth Simmons' deteriorating condition to the appropriate physicians and administration personnel;

n. in failing to have appropriate policies, procedures, and protocols to ensure that patients with conditions similar to Ruth Simmons are treated in an appropriate manner, or if the Defendant had such policies, procedures, and protocols, in failing to ensure such were carried out and followed;

o. in failing to ensure that proper diagnostic procedures were conducted on the Ruth Simmons, given the totality of the circumstances; in failing to ensure that the independent contractor physicians in the hospital performed the proper and appropriate medical treatment on the patient for which the hospital is liable as a result of the non-delegable duty of these physicians;

p. in failing to aggressively treat Ruth Simmons' condition;

q. in failing to detect signs of Ruth Simmons' deteriorating condition and to take proper precautions in treating her deteriorating condition;

r. in failing to properly diagnose and treat Ruth Simmons;

s. in failing to provide proper, diligent and timely follow-up care;

t. in failing to properly diagnose and treat the patient;

u. in failing to transfer care of patient to other, more qualified, medical personnel;

v. in violating the standards, laws, and regulations of the United States and the State of South Carolina;

w. and, in such other particulars as may be ascertained through discovery procedures undertaken pursuant to South Carolina Rules of Civil Procedure.

42. Further, to the extent that the Defendant has violated its own policies and procedures, or any state or federal laws or regulations or other standards, these standards were specifically enacted for the protection of a class of persons which includes Ruth Simmons, and the Defendant's failure to

comply with the same constitutes a prima facie case of negligence *per se*. If the Defendant had not committed the acts and omissions described above and had complied with the standard of care, Ruth Simmons would not have suffered the other damages described in this Complaint.

43. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness and departure from the professional standards of care and the generally recognized practices and procedures was the proximate cause of the Plaintiff's alleged injuries and damages by agents and employees of the Defendant, Ruth Simmons suffered and continues to suffer from severe debilitating breast cancer and has virtually no chance for long term survival and a normal life expectancy, which she would have had but for the Defendant's actions, she now has permanent injuries, permanent impairment, serious medical complications which required and will require extensive medical care and treatment and which involved and will involve significant pain and suffering, mental and emotional distress, psychological trauma, embarrassment, humiliation, disfigurement, alteration of lifestyle, medical bills, lost wages, life care costs and expenses and loss of the enjoyment of life, together with such other injuries and monetary damages, including but not limited to continued medical care, for which the Plaintiff is entitled to recover against the Defendant, an amount of actual, and any other recoverable damages to be determined by a jury and/or the Court at the trial of this action.

WHEREFORE, plaintiffs respectfully pray unto the Court for the following relief:

A. Actual damages against the United States of America in the amount of $77,000,000;

B. Costs in this action; and,

C. Such other relief as the Court deems just and proper.

        HUGHEY LAW FIRM LLC


        _____s/ D. Nathan Hughey_____
        D. Nathan Hughey (Fed. ID 7635)
        HUGHEY LAW FIRM, LLC
        767 Coleman Boulevard, Unit 2
        Post Office Box 348
        Mount Pleasant, SC 29465-0348
        Telephone:  (843) 881-8644
        Facsimile:  (888) 884-8311
        nhughey@hugheylawfirm.com

        Attorneys for Plaintiff

_____10/16_____, 2008
Mount Pleasant, South Carolina